**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

In re:

EAZY-PZ, LLC,

Debtor.

Bankruptcy Case No. 25-13720 TBM
Chapter 11

_____

**ORDER DENYING MOTION TO APPOINT TRUSTEE**
_____

## I.      Introduction.

The Debtor, Eazy-PZ, LLC (the "Debtor"), is a single-member limited liability company that designs, manufactures and sells feeding and oral care products for infants and young children.  Ten years ago, one of its competitors, Luv n' Care Ltd. ("Luv n' Care"), and Nouri E. Hakim (individually, "Mr. Hakim," and together with Luv n' Care, "LNC") sued the Debtor, and its principal, Lindsay Laurain ("Ms. Laurin"), in the United States District Court for the Western District of Louisiana (the "Louisiana Federal Court") in a patent infringement case involving a silicone dining mat for infants:  *Luv n' Care, Ltd. et al. v. Laurain et al.*, Civil Action No. 3:16-cv-777 (W.D. La.) (the "Louisiana Federal Case").

The litigation was hard-fought and bitter.  After a lengthy trial, initial ruling, appeal, and remand, on February 26, 2025, the Louisiana Federal Court issued an order and judgment determining that the Debtor's patent for the silicone dining mat "is unenforceable due to inequitable conduct [of the Debtor] when considering the evidence of misconduct in the aggregate" and dismissing the Debtor's counterclaims against LNC "under the doctrine of unclean hands."  Per the Louisiana Federal Court, the "inequitable conduct" consisted of the misconduct, "purposefully evasive testimony," "false testimony," and deceit of the Debtor's principal, Ms. Laurain, and its patent agent. The Louisiana Federal Court also issued an order and judgment awarding LNC attorney's fees and expenses of $2,737,319.66 and taxable costs of $190,461.31 to be paid by the Debtor.

The Debtor strongly disagreed with the orders judgments entered in the Louisiana Federal Case.  It lodged an appeal with the United States Court of Appeals for the Federal Circuit (the "Federal Circuit").  Meanwhile, the Debtor did not want to pay any award to LNC.  So, instead of seeking a stay on appeal from the Louisiana Federal Court or the Federal Circuit, which likely would have required the Debtor to post a supersedeas bond, the Debtor sought a costless stay by filing a Petition for relief under

Chapter 11 of the Bankruptcy Code[1] in this Court.  The bankruptcy filing triggered an initial automatic stay of the Louisiana Federal Case and the appeal per Section 362(a).

LNC is, by far, the Debtor's largest creditor; it is also a direct commercial competitor.  The bankruptcy case is mainly a two-party dispute between the Debtor and LNC.  During the course of the bankruptcy proceedings, the Debtor and LNC have fought over nearly every issue including: the scope of the Section 362(a) automatic stay (and whether it benefits Ms. Laurain individually); relief from the automatic stay; the employment of professionals; discovery; and the Debtor's reorganization plan.

About four months into the Debtor's Chapter 11 case, LNC filed a "Motion to Appoint Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)(1) and (a)(2)."  (Docket No. 170, the "Trustee Motion.")[2]  As grounds for appointment of a trustee, LNC pointed mainly to Ms. Laurain's alleged misconduct before the United States Patent and Trademark Office (the "USPTO") between 2014 and 2016 as well as malfeasance during the Louisiana Federal Case.  LNC also referred to certain alleged post-petition conflicts of interest and breaches of fiduciary duty.  The Debtor filed an "Objection." (Docket No. 186, the "Objection.")  The Court conducted a trial on the Trustee Motion and Objection during which the Court heard testimony from two witnesses and admitted voluminous exhibits into evidence.  After hearing closing arguments, the Court took the dispute under advisement.  Having considered the testimony and admitted  exhibits, the applicable law, and the post-trial legal briefs submitted by the Debtor and LNC, the Court determines that LNC has not met its burden of proof under Section 1104(a) to show that appointment of a Chapter 11 trustee is warranted either: "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management"; or "in the best interests of creditors."

## II.      Jurisdiction and Venue.

This Court has jurisdiction to enter final judgment on the contested matter of the Trustee Motion and Objection pursuant to 28 U.S.C. § 1334.  A motion to appoint a Chapter 11 trustee pursuant to Section 1104(a) is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate) and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship).  Furthermore, no party has disputed the Court's exercise of jurisdiction and entry of final judgment on the contested matter.  So, the Court finds that it has jurisdiction to enter final judgment on the Section 1104(a) dispute.  No party challenged the Debtor's choice of venue in the District of Colorado.  Thus, the Court finds that venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]      11 U.S.C. § 101 et seq.  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

[2]      Unless otherwise indicated, the Court will refer to documents from the CM/ECF docket for the main bankruptcy case, *In re Eazy-PZ, LLC*, Case No. 25-13720 (Bankr. D. Colo.) using the convention: "Docket No. ___", unless a document from the docket was marked as an exhibit and entered into the evidentiary record, in which case the Court will refer to such document by exhibit number.

### III.     Procedural Background.[3]

On June 18, 2025 (the "Petition Date"), the Debtor filed for relief under Chapter 11 of the Bankruptcy Code.  (Ex. 57.)  Contemporaneously, the Debtor submitted "Schedule E/F: Creditors Who Have Unsecured Claims."  (Ex. 57 at 14-21.)  The Debtor listed LNC as the holder of a $2,927,780.97 general unsecured claim based on a "Disputed Judgment."  (*Id*. at 20.)  The bankruptcy proceedings have been hotly contested.  LNC objected to a motion to pay the Debtor's critical vendors and to retain a professional.  (Docket Nos. 31 and 87.)  The parties sparred, in numerous motions, objections, and hearings over the scope of the Section 362(a) automatic stay, relief from stay, and whether the stay applied to protect Ms. Laurain.  (Docket Nos. 67, 92, 93, 124, 125, 126, 149, 162, 165, and 166.)  They fought over discovery.  (Docket Nos. 124, 125, 126, 127, and 149.)  LNC objected to the adequacy of the Debtor's disclosure statement.  (Docket Nos. 219 and 244.)

Meanwhile, on October 30, 2025, LNC filed the Trustee Motion.  (Docket No. 170.)  And, the Debtor filed the Objection.  (Docket No. 186.)  After an extended pre-trial process, the Court conducted a trial on the Trustee Motion and Objection on April 27, 2026.  (Docket No. 276.)  Prior to the evidentiary hearing, LNC and the Debtor submitted "Uncontested Background Facts Related to the Motion to Appoint Chapter 11 Trustee" (Docket No. 265, the "Stipulated Facts")[4] in which they stipulated to 28 discrete facts.  At the trial, the Court heard testimony from two witnesses: Lindsey Laurain, as a fact witness; and Christopher S. Crawford, as an expert in executive compensation.  The Court admitted into evidence LNC's Exhibits 2-5, 11, 21, 22, 28, 29, 31, 32, 39, 42-49, 51-53, 55-58, 62, 64-65, 68, 70, 75, 76, 89, 90, and 94-96 and Debtor's Exhibits B-L, Q-S, U, AA, BB, and CC, for all purposes.  The Court further admitted LNC's Exhibits 24-27, with the caveat that the statements made by Ms. Laurain in such exhibits were admitted for all purposes, while statements made by others were not admitted for the truth of the matters asserted.  In addition, the Court took judicial notice of LNC's Exhibits 50, 54, and 63 for the fact that they were filed, but not for the truth of any assertion therein.

After the close of evidence, counsel for both LNC and for the Debtor presented comprehensive closing arguments.  At the conclusion of the hearing, the Court ordered the parties to submit legal briefs addressing two topics:  (1) how much weight the Court should afford to the findings of fact and conclusions of law issued by the Louisiana Federal Court in the Louisiana Federal Case (primarily the findings of fact and conclusions of law appearing in Exhibits 44 and 46), given that the decisions are on appeal and relate to conduct that occurred mainly between 2014 and 2016 but also prior to trial in the Louisiana Federal Case; and (2) which burden of proof (the preponderance of the evidence standard or the clear and convincing evidence standard) applies under Section 1104(a).  On May 13, 2026, the parties submitted legal briefs on such topics.

---

[3]     The Court takes judicial notice of the docket of the Chapter 11 Case for purposes of describing the current procedural status.  *See St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may *sua sponte* take judicial notice of its docket).

[4]     The Court will refer to the Stipulated Facts by their corresponding paragraph numbers, *e.g.*, "Stip. Fact No. __."

(Docket Nos. 279 and 280.)  So, the dispute framed by the Trustee Motion and Objection is ripe for decision.

### IV.      Factual Findings.

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 and 9014(c), based upon the admissible evidence presented at the trial (including both testimony and exhibits) and the Stipulated Facts.  To the extent that the Court's identification of procedural matters prior to or during the bankruptcy case is factual in nature, the Court also incorporates as part of the factual findings the Procedural Background already identified.

### A.      Formation of the Debtor and the Debtor's Operations.

Ms. Laurain is an accomplished businesswoman.  She started her career "in corporate America . . . work[ing] at Pfizer and Humana" where she was a "director of operations."  By 2014, she was the mother of three children.  One April night, while her family was eating dinner and her children were making a mess, her husband made an offhand comment:  "somebody needs to invent something" to prevent young children from spilling and throwing food.  The comment struck a chord with Ms. Laurain.  She conducted some research and recognized a market gap.  She concluded that parents of young children needed a new product that would help reduce the mess and make mealtime better.  Ms. Laurain stuck a bowl to a piece of paper, and a concept for a child feeding mat was born.  She located a local manufacturer of silicon products and began work designing and producing an all-in-one feeding mat with self-sealing ability that could not be easily pulled off a table.

Ms. Larain formed the Debtor as a single-member limited liability company organized under Colorado law on April 10, 2014.  (Stip. Fact No. 1.)  Just a few short months later, on July 17, 2014, Ms. Laurain, individually, filed Application No. 14/333,682 (the "Application") with the USPTO, seeking a utility patent for a "Surface Contact Self-Sealing Integrated Tableware and Dining Mat," the initial product developed by Ms. Laurain (the "Dining Mat").  (Ex. EE.)  Ms. Laurain worked with a patent agent, Benjamin Williams ("Mr. Williams"), to submit the Application in an effort to protect the Dining Mat.  At some stage, the Debtor received U.S. Design Patent No. D745,327 (the "'327 Design Patent") for the Dining Mat.  On October 11, 2016, the USPTO issued United States Patent No. 9,462,903 (which is a utility patent) to Ms. Laurain for the Dining Mat (the "'903 Utility Patent").  (Ex. EE.)  Ms. Laurain is the sole named inventor on the '903 Utility Patent and the Debtor is the owner of the '903 Utility Patent by assignment from Ms. Laurain. (Stip. Fact No. 6.)

Since its formation, Ms. Laurain has been the Debtor's sole Chief Executive Officer, owner, and managing member.  (Stip. Fact No. 2.)  She works with and supervises a small team.  Tamara Falcone, the Chief Operating Officer of the Debtor, has worked with the Debtor since its inception.  Ms. Falcone manages sales channels, logistics, and inventory fulfillment.  She performs other tasks too.  Kristy Brock is the Chief Marketing Officer of the Debtor.  Ms. Brock heads up the marketing department

and its marketing and promotions channels.  She has been with the Debtor for about 12 years.  Lisa Foke is the Chief Financial Officer of the Debtor.  She manages the Debtor's financial operations, including budgeting, cash projections, financial management, and transfers.  She started with the Debtor around 2019.  The Debtor also employs a speech language pathologist, Dawn Winkelman, who joined the company not long after it was formed.  Ms. Winkelman has worked with over 10,000 babies and has a special-needs focus.  Early on, she identified opportunities for innovation by the Debtor.  The Debtor's products are mainly designed in Colorado but manufactured in the People's Republic of China.

Though the Debtor initially built its business around the Dining Mat, it now offers other related products for infants and young children, including toothbrushes, feeding utensils, cups, plates, and food cutters.  All of the Debtor's products are designed to help babies gain motor strength and hit developmental milestones, with a focus on developmental growth, and are devised with the input of a speech language pathologist and others.  The Debtor spends substantial time and resources developing, designing, testing, and retesting its products in addition to ensuring regulatory compliance.  The Debtor's products are sold by Pottery Barn Kids, Nordstrom, Target, Amazon, and other stores, as well as through the Debtor's internet website.

Ms. Laurain is proud of the Debtor and its products.  She works hard for the Debtor, usually from when she rises in the morning until she goes to bed in the evening.  Besides the occasional sporting event for her children, Ms. Laurain stated that "all I do is work" for the Debtor.  In addition to her normal day-to-day activities, she has promoted the Debtor's products in other ways; for example, by making industry presentations; appearing in a popular television show for entrepreneurs, Shark Tank; and speaking at conferences.

In 2016, the Debtor reached an agreement with Buy Buy Baby, a large baby retailer with hundreds of stores nationwide, through which the Debtor was able to set up large displays in each store to show its products.  The Debtor conducted substantial business with Buy Buy Baby, which became one of its largest customers.  By 2016, just two years after Ms. Laurain founded the Debtor, the company was earning over $6 million in annual sales (mainly related to the Dining Mat).

## B.     The Debtor's Pre-Petition Economic Performance.

In 2021, the Debtor earned $15,418,199.73 in gross revenue.  (Ex. BB at 1-2.)  After deducting costs of goods sold, expenses, and other amounts, the Debtor earned net income of $2,334,930.62.  (*Id.*)  For 2022, the Debtor earned gross revenue of $13,607,865.91 and reported net income of $1,877,599.47.  (*Id.*)  However, in 2023, Buy Buy Baby filed for bankruptcy and closed all of its stores.  As a result, the Debtor lost one of its most significant sources of revenue.  The Debtor's 2023 gross revenue went down to $11,206,252.89, and the Debtor realized a net loss for the first time: - $157,089.02.  (*Id.*)

The Debtor suffered further declines in 2024 and the first half of 2025.  In 2024, the Debtor's gross revenues dropped to $7,389,330.41 and it suffered a net loss of - $464,155.09, a decrease that Ms. Laurain attributes to increased legal expenses incurred in connection with the Louisiana Federal Case, as well as increased advertising costs.  (*Id.*)  The Debtor fared no better in 2025 and filed for bankruptcy halfway through the year after an adverse result in the Louisiana Federal Case.

**C.       Ms. Laurain's Pre-Bankruptcy Compensation.**

In 2021, Ms. Laurain received $1,471,830.03 in aggregate distributions from the Debtor.  Such amount constituted about ten percent (10%) of gross revenues.  (Ex. BB.) In 2022, as compensation, Ms. Laurain received $1,167,897.90 in aggregate distributions, or roughly nine percent (9%) of the Debtor's gross revenues.  (*Id.*; and Stip. Fact No. 24.)  In 2023, Ms. Laurain took aggregate distributions of $1,362,670.73 from the Debtor and made capital contributions of $221,038.27.  (Ex. BB; and Stip. Fact No. 25.)  Net of contributions, Ms. Laurain's compensation for 2023 tallied to about twelve per cent (12%) of the Debtor's gross revenues.  In 2024, the year after the Buy Buy Baby arrangement collapsed, the Debtor (at Ms. Laurain's direction) reduced her distributions to $342,131.48.  But, Ms. Laurain also made capital contributions of $205,000.00 to the Debtor.  So, her compensation, net of contributions, was only about two percent (2%) of the Debtor's gross revenues in 2024.  (Ex. BB; and Stip. Fact No. 26.)  Averaging the four years prior to the bankruptcy filing, Ms. Laurain received distributions that totaled approximately eight percent (8%) of gross revenues.  (Ex. BB.)

**D.       The Dispute Between the Debtor and LNC.**

LNC, operating under the tradename "Nuby," is one of the Debtor's most significant competitors in the juvenile feeding products (and accessories) market.  Ms. Laurain palpably dislikes LNC.  In 2016 (after the issuance of the '327 Design Patent but prior to the issuance of the '903 Utility Patent), she posted a statement to a Facebook group comprised of around 200 people:  "I HATE Nuby, ugh their website makes me sick."  (Ex. 24 at 1.)  And, later, she wrote: "They [Nuby] are the WORST.  I won't by [sic] from big companies anymore. . . . "  (*Id*. at 4.)  While Ms. Laurain dislikes Nuby, it is quite clear that Nuby's principals also dislike Ms. Laurain.  Their animosity is mutual.

Ms. Laurain's dislike for LNC stems from her belief that, after the Debtor spent time, money, and energy on its design, development, testing, and manufacture of the Dining Mat (and other products), as well as submitting the Application, Nuby copied the Debtor's design for the Dining Mat and other products, produced them at a lower cost, and then undercut the Debtor by selling the products for less in the marketplace.  Ms. Laurain views LNC's alleged copying and sale practices as unfair and illegal competition.

To illustrate the basis for her belief that Nuby copied the Debtor's designs, during the trial, Ms. Laurain displayed certain products made by the Debtor and certain

products made by Nuby.  The Court finds that the Debtor's products and Nuby's products were strikingly similar.  Indeed, Ms. Laurain herself initially misidentified one product as the Debtor's product when, in fact, it was a Nuby product.

Based on her concern that Nuby's actions were harming the Debtor's interests and, determined to protect the Debtors' then-pending Application for a utility patent, Ms. Laurain consulted legal counsel.  In March 2016 (before the '903 Utility Patent issued), the Debtor's lawyer, Jordan Bolton, told Ms. Laurain that "he had not seen anything actionable" from LNC.  Notwithstanding receiving such advice, Ms. Laurain instructed Mr. Williams, the Debtor's patent agent, to send two cease-and-desist letters to LNC related to the Dining Mat in March and April 2016.  The Debtor warned Nuby that it had a pending Application for a utility patent on the Dining Mat.

Nuby did not respond to the cease-and-desist letters.  The lack of response angered and frustrated Ms. Laurain.  Indeed, in public posts on social media, Ms. Laurain accused Nuby of violating the Debtor's patent even though the Debtor had only a design patent and not a utility patent at that time.  (Ex. 25.)  Further, Ms. Laurain encouraged members of a 200-person Facebook group to engage in efforts to post negative comments about Nuby on social media and to boycott Nuby.  (Exs. 26 and 27.) She even said she wanted to do a documentary to expose and destroy Nuby.  (Ex. 29.)

E.     **The Louisiana Federal Case and Appeals to the Federal Circuit.**

Ms. Laurain planned for the Debtor to sue LNC as soon as the Debtor received a utility patent for the Dining Mat based on the Application.  However, before the Debtor could sue LNC, LNC commenced its own lawsuit, the Louisiana Federal Case, against the Debtor and Ms. Laurain in the Louisiana Federal Court on June 4, 2016.  (Stip. Fact No. 3.)  In the Louisiana Federal Case, LNC asserted claims under the Louisiana Unfair Trade Practices Act, LA. REV. STAT. § 15:1401 *et. seq.* ("LUPTA"), and the Lanham Act, 15 U.S.C. § 1125(a) *et seq.*, related to Ms. Laurain's and the Debtor's assertions that LNC was infringing a utility patent that, at the time, had not yet issued.  (Stip. Fact No. 4; and Ex. 43 at 16.)  LNC also asked that the '327 Design Patent be declared invalid, unenforceable, and not infringed.

The USPTO subsequently issued the '903 Utility Patent to Ms. Laurain on October 11, 2016.  (Stip. Fact No. 4).  Thereafter, LNC filed an amended complaint, adding to its declaratory judgment claim a request that the '903 Utility Patent be declared invalid, unenforceable, and not infringed. (*Id.*)  The Debtor disputed LNC's claims in the Louisiana Federal Case, filed counterclaims for infringement of the '327 Design Patent and the '903 Utility Patent, and advanced other counterclaims for copyright, trademark, and trade dress infringement, violation of the LUPTA, and unjust enrichment. *Luv n' Care, Ltd. et al. v. Laurain et al.*, 98 F.4th 1081, 1093 (D.C. Cir. 2024) [hereinafter "*Luv n' Care*"].[5] (*See also* Stip. Fact No. 5.)   The Debtor sought

---

[5]     A copy of *Luv n' Care, Ltd. et al. v. Laurain et al.*, 98 F.4th 1081, 1093 (D.C. Cir. 2024) was admitted into evidence as Exhibit 43.  For purposes of clarity, the Court will cite to the case by its legal citation in lieu of reference to Exhibit 43.

7

more than $2 million in damages against LNC, not including attorney's fees.  (Stip. Fact No. 8.)  LNC contested the Debtor's counterclaims and asserted again that Debtor's '327 Design Patent and the '903 Utility Patent were invalid, unenforceable, and not infringed, which claims the Debtor denied.  *Luv n' Care*, 98 F.4th at 1091-92.  (*See also* Stip. Fact No. 5.)

Early in the Louisiana Federal Case, the Debtor and LNC engaged in settlement discussions.  However, Ms. Laurain ultimately decided that she did not want the Debtor to settle.  As she explained it, she was "passionate about sticking up" for the Debtor's rights.  The Louisiana Federal Court dismissed Ms. Laurain as a defendant from the Louisiana Case in 2016.  (Stip. Fact No. 6.)  In May 2020, the Louisiana Federal Court entered summary judgment in favor of LNC and against the Debtor on LNC's claim that the '903 Utility Patent was obvious as a matter of law.  *Luv n' Care*, 98 F.4th at 1091-92.  (*See also* Stip. Fact No. 9.)

The Louisiana Federal Court conducted an eight-day bench trial in August 2021.  (Stip. Fact No. 11.)  Thereafter, on December 21, 2021, the Louisiana Federal Court issued a ruling (the "Initial Ruling") in which, among other things, it dismissed all of the Debtor's counterclaims and entered judgment in favor of LNC and against the Debtor upon finding that the Debtor was barred by the doctrine of unclean hands from obtaining relief.  (Stip. Fact No. 11; and Ex. 39.)[6]  In so doing, the Louisiana Federal Court determined that Mr. Bolton (the Debtor's outside general counsel) and Ms. Laurain had been evasive in their testimony at trial and that their repeated evasive testimony established deceit.  (Ex. 44 at 129.)   The Federal Circuit later summarized the Louisiana Federal Court's Initial Ruling on unclean hands as follows:

> [The Louisiana Federal Court] determined that unclean hands barred [the Debtor] from obtaining relief on its then-remaining counterclaims.  In particular, the court found that [the Debtor] engaged in litigation misconduct, including by failing to disclose certain patent applications during discovery, attempting repeatedly to block LNC from obtaining Ms. Laurain's prior art searches, stringing LNC along during settlement negotiations, and providing evasive and misleading testimony.  The [Louisiana Federal Court] concluded that [the Debtor] "by deceit and reprehensible conduct attempted to gain an unfair advantage" and, thus, "is not entitled to the relief it seeks."

*Luv n' Care*, 98 F.4th 1081, 1093 (D.C. Cir. 2024).

With respect to LNC's claims against the Debtor, the Louisiana Federal Court ruled that LNC had not met its burden of proving that the '903 Utility Patent should be rendered unenforceable due to inequitable conduct under any of its theories.  (Ex. 39.)

---

[6]     Neither the Debtor nor LNC offered the Initial Ruling into evidence.  So, the Court did not admit the Initial Ruling into evidence.

In the Initial Ruling, the Louisiana Federal Court did not find inequitable conduct by Ms. Laurain or her patent agent, Mr. Williams, in connection with prosecution of the '903 Utility Patent before the USPTO.  (Stip. Fact No. 11; and Ex. 44 at 43-51.)

In February 2022, LNC filed motions for attorney's fees and costs, seeking to recover more than $5 million in fees and $400,000 in costs from the Debtor.  (Stip. Fact No. 12.)  The Debtor also filed a motion for attorney's fees, seeking to recover approximately $1.1 million in fees from LNC.  (Stip. Fact No. 13.)  On June 9, 2022, the Louisiana Federal Court denied both attorney's fees motions.  (Stip. Fact No. 14; and Ex. 42.)

On June 10, 2022, LNC filed a notice of appeal in the Federal Circuit, commencing an appellate case; the Debtor filed a notice of cross-appeal shortly thereafter (together, the "First Appeal").  (Stip. Fact No. 15.)  On April 12, 2024, the Federal Circuit issued a decision on the First Appeal: *Luv n' Care*, 98 F.4th 1081.  The Federal Circuit determined that the Louisiana Federal Court had not abused its discretion in finding in the Initial Ruling that the Debtor's unclean hands barred it from obtaining relief on its counterclaims.  Thus, the Federal Circuit affirmed the Louisiana Federal Court's dismissal of the Debtor's counterclaims, including for alleged infringement of the '327 Design Patent and the '903 Utility Patent.  *Luv n' Care,* 98 F.4th at 1094-96.  (*See also* Stip. Fact No. 16.)

In *Luv n' Care*, 98 F.4th 1081, the Federal Circuit also vacated three portions of the Louisiana Federal Court's Initial Ruling.  *First*, the Federal Circuit vacated the Louisiana Federal Court's determination that LNC failed to meet its burden of establishing inequitable conduct that would render the '903 Utility Patent unenforceable. *Id.* at 1096-99.  (*See also* Stip. Fact No. 16.)  *Second*, the Federal Circuit vacated the Louisiana Federal Court's ruling that the '903 Utility Patent was invalid for obviousness, determining that questions of material fact precluded entry of summary judgment on the issue.  *Id.* at 1099-1104.  (*See also* Stip. Fact No. 16.)  And, *third,* the Federal Circuit vacated the Louisiana Federal Court's orders denying attorneys' fees and costs to LNC pursuant to 35 U.S.C. § 285, which allows a court in exceptional cases to award reasonable attorney's fees to a prevailing party, finding that the Louisiana Federal Court erred by failing to declare LNC the prevailing party. *Id.* at 1105-1107.  (*See also* Stip. Fact No. 16.)  Ultimately, the Federal Circuit remanded the foregoing matters to the Louisiana Federal Court with instructions to reconsider the issues of inequitable conduct, obviousness, and attorney's fees and costs.  *Id.* at 1104 and 1107.  (*See also* Stip. Fact No. 17.)  Importantly, the Federal Circuit confirmed that "LNC is the prevailing party — and will remain so no matter how the remand turns out . . . ." *Id*. at 1106.  The Federal Circuit issued its Mandate on July 24, 2024.[7]

---

[7]     The Mandate was not entered into evidence.  However, the Court takes judicial notice that the Mandate associated with *Luv n' Care*, 98 F.4th 1081, issued on June 24, 2024, in the Louisiana Federal Case.  *See United States v. Ahidley,* 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) (recognizing that court may exercise its discretion "to take judicial notice of publicly-filed records in [its] court and certain other courts concerning matters that bear directly upon the disposition of the case at hand).

9

On February 26, 2025, after further proceedings on remand but without hearing any additional evidence, the Louisiana Federal Court issued: (1) a "Second Amended Ruling Following Remand from the Federal Circuit and Final Judgment" (Ex. 44, the "Second Amended Ruling"); (2) an "Amended Ruling Following Remand from the Federal Circuit" (Ex. 46, the "Fees and Costs Ruling"); (3) an "Amended Order Following Remand from the Federal Circuit" (Ex. 47, the "Fees and Costs Judgment"); and (4) a "Final Judgment" (Ex. 45, the "Merits Judgment").

In the Second Amended Ruling, the Louisiana Federal Court determined that LNC proved by clear and convincing evidence that the '903 Utility Patent was unenforceable due to inequitable conduct.  (Ex. 44; and Stip. Fact No. 18).  The Louisiana Federal Court also renewed its determination (from the Initial Ruling) that LNC proved by clear and convincing evidence that the Debtor's counterclaims should be dismissed under the doctrine of unclean hands. (Ex. 44.)  The Louisiana Federal Court did not award damages to either party and, given its finding that inequitable conduct was dispositive of the entire case, denied as moot LNC's motion to deem the '903 Utility Patent invalid on ground of obviousness.  (Ex. 44 at 133-34.)  The foregoing was confirmed through entry of the Merits Judgment.  (Ex. 45.)

As relevant to the Trustee Motion, LNC highlighted the following factual findings or determinations made by the Louisiana Federal Court in the Second Amended Ruling (which bear on the misconduct of the Debtor and Ms. Laurain):

- "Mrs. Laurain's and Mr. Williams' choice to misrepresent the Platinum Pets mat was purposeful, deliberate, and egregious." (Ex. 44 at 4.)

- "Mr. Williams made a conscious and deliberate choice, and Mrs. Laurain knowingly agreed, not to disclose the first video (*i.e.*, the Undisclosed Video) to the PTO where the mat made a 'suctioning noise' and 'tries to self-seal.'  . . . . This was an affirmative and intentional decision to mislead the PTO."  (*Id*. at 5.)

- "In sum, the conscious and deliberate misconduct on the part of Mrs. Laurain and Mr. Williams was both affirmative and egregious." (*Id*.)

- "As discussed, Mrs. Laurain and Mr. Williams purposely misrepresented to the PTO that the Platinum Pets mat, '[e]ven though made of silicone, this device fails to make sealable contact with the underlying surface.'"  (*Id*. at 6.)

- "Thus, the Court finds that the undisclosed prior art references that: (1) were made of silicone, (2) were preventative of lateral displacement, and (3) had the self-sealing characteristic, would have taught more that the Platinum Pets mat as misrepresented by Mrs. Laurain and Mr. Williams, and therefore were non-cumulative." (*Id*. at 8.)

10

●    "Regarding deceptive intent, '[t]here simply is no justification for telling the [PTO] about the prior art disclosing the problem' (i.e., the silicone products that supposedly did not self-seal) 'while concealing key prior art disclosing the solution' (i.e., the undisclosed self-sealing products)."  (*Id*. at 8-9.)

●    "Thus, the Court finds that Mrs. Laurain and Mr. Williams knew the statements in the declarations of Chua, Prager, and Clark (some of which Laurain herself drafted) were false, but they nonetheless submitted them to the PTO.  Submission of false affidavits is affirmative egregious misconduct making them *per se* material."  (*Id*. at 10.)

●    "Mrs. Laurain and Mr. Williams were fully aware of EZPZ's branding and marketing activities, and therefore knew (based on direct evidence) that the statements in the declarations concerning a lack of 'marketing strategies' and 'branding' were false, and they submitted them to the PTO with deceptive intent."  (*Id*. at 12.)

●    "Therefore, the record evidence considered in the aggregate, compel a finding that Mr. Williams and Mrs. Laurain knew statements in the declarations of Chua and Clark (claiming commercial success unrelated to branding), and the declaration of Prager (claiming commercial success absent persuasion by branding or marketing strategies) were false, and they submitted them to the PTO with deceptive intent."  (*Id*. at 12.)

●    "Mr. Williams' and Mrs. Laurain's multiple acts of misconduct, when considered in the aggregate, establish a pattern of lack of good faith and candor in their dealings with the PTO.  Based on the above and outlined below, and under the guidance of the court of appeals, the district judge feels it is necessary to find that Mr. Williams and Mrs. Laurain committed inequitable conduct, and that the '903 [Utility] Patent is unenforceable."  (*Id*. at 15-16.)

In addition to the foregoing, the Second Amended Ruling is peppered throughout with additional factual findings that the Debtor, Ms. Laurain, and Mr. Williams: "made a conscious and intentional choice not to disclose . . . to the USPTO"; "misrepresented the characteristics" to the USPTO; "misrepresent[ed] the actual functionality of the Platinum Pets Mat" to the USPTO; made a "choice to misrepresent the Platinum Pets mat [that] was purposeful, deliberate, and egregious"; and engaged in "deceptive intent" vis-à-vis the USPTO.  (*Id*. at 68, 69, 69 n.410, 73, 74, and 89.)  With respect to Ms. Laurain, the Louisiana Federal Court also found:  "The repeated false or inconsistent testimony, and misrepresentations from Mrs. Laurain establishes deceit."; and "At the bench trial, the Court heard evasive, false and misleading testimony and misrepresentations from the mouth of Mrs. Laurain, conduct that is offensive to the integrity of the Court."  (*Id*. at 132 and 133.)  The Second Amended Ruling was confirmed through entry of the Merits Judgment.

11

In the Fees and Costs Ruling, the Louisiana Federal Court determined that the case was exceptional pursuant to 35 U.S.C. § 285 and awarded LNC attorney's fees in the amount of $2,737,319.66 and costs in the amount of $190,471.31 (together, the "Fees and Costs Award"). (Ex. 46.) The Court declined to hold Ms. Laurain personally liable for the Fees and Costs Award, finding that there was insufficient evidence that the Debtor would be unable to pay the Fees and Costs Award and further that the record was not sufficient to reach through the Debtor to Ms. Laurain. The Louisiana Federal Court warned that it would carefully review Ms. Larain's future actions in the Louisiana Federal Case, and stated that "at some point the Court may find it necessary to hold Ms. Laurain joint and severally liable in this case." (Ex. 46 at 40.) The foregoing also was confirmed through entry of the Fees and Costs Judgment. (Ex. 47.)

LNC appealed the Louisiana Federal Court's Second Amended Ruling (and Merits Judgment) and Fees and Costs Ruling (and Fees and Costs Judgment) to the Federal Circuit. The Debtor cross-appealed. The appeals are docketed as Appeal No. 25-1537 (the "Second Appeal"). (Stip. Fact No. 20.) The Second Appeal is pending.

At this stage, the Debtor and LNC have been fighting over intellectual property rights and competition for more than a decade. As set forth previously, Ms. Laurain dislikes LNC. And the feeling is mutual: LNC and its management (including Mr. Hakim) dislike the Debtor and Ms. Laurain. For example, at a trade show held in Germany in 2016, Ms. Laurain recalled that Mr. Hakim approached Ms. Laurain "got into [Ms. Laurain's] face" and said "How are you going to like it when Nuby's on the outside of your booth? How are you liking all the fifteen summary judgment motions we just filed against you?" He then turned around and, with his hands positioned as though he was wearing handcuffs and getting arrested, walked away. Ms. Laurain felt threatened. Per Ms. Laurain, Mr. Hakim has disparaged the Debtor and Ms. Laurain. In a May 2, 2016 e-mail concerning "EZPZ at Buy Buy Baby," Mr. Hakim stated graphically to a co-worker: "We are going to tear their ASS [the Debtor's ass] a new asshole." (Ex. S.) Although the hard feelings seem to have originated around 2016, the passage of time has not healed the relationship between the Debtor and LNC.

## F.    The Bankruptcy Case and Post-Petition Developments in the Louisiana Federal Case and Second Appeal.

Faced with the across-the-board loss in the Louisiana Federal Court's Second Amended Ruling (and Merits Judgment) and Fees and Costs Ruling (and Fees and Costs Judgment), the Debtor did not initially request or obtain a stay from the Louisiana Federal Court or the Federal Circuit. Instead, after commencement of the Second Appeal, on June 18, 2025, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code and is currently operating as a debtor in possession pursuant to Sections 1107 and 1108. (Stip. Fact No. 21.) The Debtor candidly acknowledges that the Louisiana Federal Case and entry of the Second Amended Ruling (and Merits Judgment) and Fees and Costs Ruling (and Fees and Costs Judgment), along with the loss of revenues resulting from Buy Buy Baby's closing, led

12

to its bankruptcy filing.  The Debtor also asserts that the current tariff environment has created uncertainty and negatively affected its performance during the bankruptcy case.

### 1. The Debtor's Assets and Liabilities.

#### a. The Debtor's Assets.

On its Schedule A/B, the Debtor listed property with an aggregate value of $1,019,774.99.  (Ex. 57 at 6.)  Such amount includes cash held in bank accounts with a total value of $36,366.51, accounts receivable in the amount of $732,899.61, and inventory with a value of $250,508.87.  (*Id*. at 7-11.)  The Debtor also identified property interests with unknown values, including interests in patents, copyrights, and trademarks. (*Id*.)  The Debtor did not list any potential claims for malpractice (for example, against Mr. Williams) on its Schedule A/B.  (*Id*.)

#### b. The Debtor's Liabilities.

On its Schedule D, the Debtor listed secured claims in the total amount of $532,046.34.  (*Id*. at 12-13.)  On its Schedule E/F, the Debtor listed general unsecured claims totaling $3,349,211.23, including LNC's claim in the amount of $2,927,780.97, which it identifies as a "Disputed Judgment."  (*Id*. at 12-21; Stip. Fact No. 19.)

### 2. The Debtor's Monthly Operating Reports.

The Debtor has timely filed monthly operating reports throughout the bankruptcy case, including supporting documents.  (Exs. D-L; and Docket Nos. 270, 289, 297, and 298.[8])  All such reports were signed by Ms. Laurain under penalty of perjury.  No evidence was presented which refuted any information set forth in the monthly operating reports.

The Debtor reported $65,603 in cash as of June 1, 2025 (the month in which it filed for bankruptcy protection).  (Ex. D.)  From that starting place, the Debtor's monthly operating reports show the following cash and disbursements:

| Month | Receipts | Disbursements | End of Month Cash Balance |
|---|---|---|---|
| June 2025 | $215,616 | $51,943 | $229,276 |
| July 2025 | $271,909 | $211,857 | $289,328 |
| August 2025 | $199,997 | $226,832 | $262,493 |
| Sept. 2025 | $508,014 | $552,737 | $217,769 |
| Oct. 2025 | $263,871 | $229,348 | $252,367 |
| Nov. 2025 | $335,876 | $362,783 | $225,198 |
| Dec. 2025 | $577,309 | $641,021 | $161,487 |

---

[8]   The monthly operating reports for March, April, May, and June 2026 (Docket Nos. 270, 289, 297, and 298) were not admitted into evidence since they mainly post-dated the April 27, 2026 trial.  However, the Court takes judicial notice that such monthly operating reports were filed.

| | | | |
|---|---|---|---|
| Jan. 2026 | $417,155 | $306,023 | $272,619 |
| Feb. 2026 | $316,248 | $371,313 | $217,554 |
| March 2026 | $305,762 | $287,387 | $235,928 |
| April 2026 | $341,958 | $367,566 | $210,320 |
| May 2026 | $481,690 | $325,954 | $366,057 |
| June 2026 | $530,552 | $433,061 | $463,547 |

(Exs. D-L; and Docket Nos. 270, 289, 297, and 298.)

The Debtor is current on tax filings, tax payments, and payments for United States Trustee fees. It has not engaged in post-petition borrowing other than trade credit. (*Id.*) Annualized, the foregoing demonstrates that while the Debtor's gross revenue has been materially less than during recent pre-bankruptcy periods, the Debtor is holding its own and has increased its cash position from $65,603 to $463,547. As compared to the start of the bankruptcy case, the Debtor also has increased its accounts receivable, increased its inventory, and increased its total assets although its post-petition payables also increased to a lesser extent. (*Compare* Ex. D with Docket No. 298.)

3.      **Ms. Laurain's Compensation in 2025 and During the Bankruptcy Case.**

After the Debtor filed for bankruptcy protection, Ms. Laurain ceased to take draws from the Debtor and instead became (for the first time) a salaried employee. In 2025, she received distributions of $114,921.10 and salary of $135,416,71 — for a total of $250,337.81 in compensation. (Ex. BB.) Ms. Laurain also made contributions of $20,000 in 2025. (*Id.*) Ms. Laurain's combined compensation for 2025, net of contributions, amounts to approximately four percent (4%) of gross revenues. (Ex. BB.) In 2026, Ms. Laurain will receive salary of $250,000. She does not anticipate taking any distributions. Annualization of reported 2026 monthly gross revenue (for January to June 2026) suggests that the Debtor may earn approximately $4,786,000 in annual 2026 gross revenue. Thus, Ms. Laurain's projected $250,000 salary would be about five percent (5%) of gross revenues for 2026.

The Debtor engaged Christopher S. Crawford ("Mr. Crawford"), an expert in executive compensation, to evaluate the reasonableness of Ms. Laurain's compensation before and after the Debtor's bankruptcy filing. Mr. Crawford is a very well-qualified expert on executive compensation. (Ex. AA.) The Court found Mr. Crawford's testimony to be highly credible.

Mr. Crawford began his evaluation by interviewing Ms. Laurain. He evaluated the Debtor's (current and historic) business operations and financial data with a focus on gross revenue. Mr. Crawford testified that gross revenue is a key driver in executive compensation and has the highest correlation to determining the appropriate amount of chief executive officer pay as well as the reasonableness of such pay. Mr. Crawford analyzed four executive compensation surveys, including data from the Economic

14

Research Institute, Comp Analyst, Chief Executive Report, and PAVE, as a basis for evaluation of Ms. Laurain's compensation.  Based on Mr. Crawford's analysis and testimony, Ms. Laurain's compensation as Chief Executive Officer is on the low end for a company of similar size and character to the Debtor — slightly below the 50th percentile.  Mr. Crawford opined that it would be difficult to find a Chief Executive Officer to replace Ms. Laurain in the specialty products space at a similar rate of compensation.  Further, he testified that hiring a replacement Chief Executive Officer while the Debtor is in bankruptcy and is pursuing the Second Appeal likely would require payment of a premium by the Debtor to an executive candidate.

Based on Mr. Crawford's unrefuted testimony and analysis (which the Court accepts and finds compelling), the Court determines Ms. Laurain's post-bankruptcy compensation is reasonable.  Further, the Debtor would be unlikely to be able to hire someone with Ms. Laurain's expertise and dedication to the Debtor's business without paying substantially more compensation.

### 4. Other Events in the Bankruptcy Case.

#### a. Attempted Employment of Mr. Williams as Special Counsel for the Debtor.

On July 23, 2026, the Debtor filed an "Application to Employ Williams Intellectual Property as Special Counsel." (Ex. 58, the "Williams Application.")  The Debtor sought authorization pursuant to Section 327(e) to employ Williams Intellectual Property, and Mr. Williams, as special counsel to represent the Debtor in the Louisiana Federal Case and the Second Appeal.  Both LNC and the United States Trustee (the "UST") objected to the Williams Application, partly on the ground that the Louisiana Federal Court had denied Williams Intellectual Property's request for permission to represent the Debtor in the Louisiana Federal Case based on its findings of inequitable conduct by Mr. Williams. (Docket Nos. 86 and 87.)  LNC and the UST also asserted that Mr. Williams should not be employed because he held or represented an interest adverse to the Debtor's bankruptcy estate.  LNC further suggested that the Debtor might have a potential malpractice claim against Mr. Williams stemming from his misconduct during prosecution of the '903 Utility Patent which rendered his relationship to the Debtor adverse.

In the face of such objections, the Debtor withdrew the Williams Application (Ex. 62) and filed an "Application to Employ Stephen P. Bosco as Appeal Counsel" (Docket No. 121, the "Bosco Application").  In the Bosco Application, the Debtor requested authorization to employ Stephen P. Bosco ("Mr. Bosco") to represent the Debtor in the Second Appeal.  LNC Objected to the Bosco Application.  (Docket No. 146.)  Further litigation followed.  The Court overruled LNC's objection and granted the Bosco Application.  (Docket No. 176.)

15

**b.**        **Disputes Regarding the Automatic Stay, Fed. R. Bankr. P. 2004 Examination, and the Second Appeal.**

The Debtor's bankruptcy filing stayed the Louisiana Federal Case and the Second Appeal.  The status and scope of the automatic stay (and relief from stay) became matters of significant dispute between the Debtor and LNC.

One month after the Debtor filed for Chapter 11 protection, on July 18, 2025, LNC filed "Luv n' Care Ltd.'s Motion to Confirm Absence of Automatic Stay for Actions Against Non-Debtor Lindsey Laurain."  (Ex. 63, the "Motion to Confirm Absence of Stay.")  The Debtor objected (Ex. 64) and also filed its own "Motion to Extend Stay to Actions Against Non-Debtor Lindsey Laurain."  (Ex. 65, the "Motion to Extend Stay.")  LNC objected.  (Docket No. 98.)  Later, the Debtor filed a "Motion to Enforce the Automatic Stay."  (Ex. 76, the "Motion to Enforce.")  LNC objected.  (Docket No. 185.)  LNC also filed an "*Ex Parte* Motion for Order Authorizing Rule 2004 Examination of Debtor and Debtor's Managing Member, Lindsey Laurain, Pursuant to Fed. [R.] Bankr. P. 2004."  (Docket No. 106, the "2004 Motion.")  The Court granted the 2004 Motion.  (Docket No. 108.)  The parties engaged in significant litigation concerning all of the foregoing and related issues.  (Docket Nos. 124, 125, 129, 145, 149, 153, 162, 165, 166, 178, 185, and 189.)  Ultimately, the Court granted the Motion to Confirm Absence of Stay.  (Ex. 68 and Docket No. 129.)  The Debtor withdrew the Motion to Extend Stay.  (Docket No. 129.)  The Court allowed a Fed. R. Bankr. P. 2004 examination of Ms. Laurain.  (Docket Nos. 108 and 168.)  And, the Court denied the Motion to Enforce.  (Docket No. 227.)

On November 21, 2025, the parties, jointly, filed a "Stipulated Motion for Relief from the Automatic Stay with Respect to Appeal to the Federal Circuit" (Docket No. 187, the "Stipulated Motion for Relief") wherein they agreed to modify the automatic stay to allow the parties to appeal, and cross-appeal, the Louisiana Federal Court's Second Amended Ruling (and Merits Judgment) and Fees and Costs Ruling (and Fees and Costs Judgment) to the Federal Circuit and take appropriate actions in the Louisiana Federal Court to effect the Second Appeal.  The Court granted the Stipulated Motion for Relief.  (Docket No. 199.)

All of the foregoing shows that the Debtor and LNC engaged in unusually extensive litigation about the automatic stay and a Fed. R. Bankr. P. 2004 examination.  The Court finds that the conduct of both the Debtor and LNC was decidedly combative and unconstructive.  The Court was required to expend significant time and resources deciding all the unnecessary disputes.  However, the matters appear to be concluded.

**c.**        **The Debtor's Plan of Reorganization**

On January 14, 2026, the Debtor filed a "Plan of Reorganization Proposed by Debtor" (Ex. 90, the "Plan") and a "Disclosure Statement for Plan of Reorganization Prepared by Debtor." (Ex. 89, the "Disclosure Statement.")

16

In its Disclosure Statement, the Debtor identified assets and liabilities based on both its Schedules and Proofs of Claim.  The Debtor stated that the liquidation value of its "total assets" was $894,520.55.  It also listed priority tax claims in the total amount of $3,502.98, secured claims in the total amount of $484,265.83, and unsecured claims in the total amount of $3,397,320.42, including LNC's disputed claim in the amount of $2,927,780.97.  (Ex. 89 at 16.)

In the Plan, the Debtor proposed, generally, to continue its operations with Ms. Laurain at the helm.  The Debtor also stated that it intended to prosecute the Second Appeal and otherwise try to reverse the Louisiana Federal Court's Second Amended Ruling (and Merits Judgment) and Fees and Costs Ruling (and Fees and Costs Judgment).  The Debtor proposed to fund Plan payments with proceeds from operations and from proceeds of any litigation the Debtor might commence, including the litigation against LNC.  Further, the Debtor proposed to create a "Net Profits Fund" from which creditors would be paid a twenty-five percent (25%) portion, with administrative claims such as professional fees incurred during the bankruptcy case paid first (to Class 1), followed by priority tax claims (to Class 2), secured claims (to Classes 3 and 4), and general unsecured claims (to Class 5, including LNC).  The Debtor proposed to use the remaining 75 percent (75%) of net profits to continue to run and grow the Debtor's business.  Upon completion of the Plan, the Debtor proposed that Ms. Laurain would retain her equity interest in the Debtor.  The Debtor projected that the Plan would be superior to a Chapter 7 liquidation in terms of payout to unsecured creditors.  (Ex. 90.)

The Debtor has not disclosed any potential malpractice claims in its Schedules, and has not specifically proposed in the Plan to prosecute malpractice actions against any of the lawyers who had represented it in the Louisiana Federal Case, nor against Mr. Williams for any alleged misconduct in his role as patent agent for the Debtor.  (Ex. 57 and Ex. 90.)

Both the UST and LNC filed Objections (Docket Nos. 243 and 244, respectively) to the Disclosure Statement.  At a hearing to determine the adequacy of the Disclosure Statement pursuant to Section 1125, the parties reported that they had agreed that the dispute regarding the Disclosure Statement should be held in abeyance pending the Court conducting a trial and ruling on the Trustee Motion.  The Court agreed.  The dispute over the Disclosure Statement is currently in abeyance.  (Docket No. 251.)

### d.    <u>Changes in Terms of Employment of Mr. Bosco as Special Counsel.</u>

On February 20, 2026, the Debtor filed a "Supplemental Application to Employ Reichman Jorgensen Lehman & Feldberg LLP as Appeal Counsel" (Docket No. 245, the "Supplemental Application") in which it advised the Court that Mr. Bosco had joined the law firm of Reichman Jorgensen Lehman & Feldberg LLP ("RJLF") and that the Debtor wished to employ RJLF to represent the Debtor in the Second Appeal and to appear in the Louisiana Federal Case in order to preserve the Debtor's appellate rights and facilitate the Second Appeal.  In the Supplemental Application, the Debtor advised

17

that Mr. Bosco had agreed to waive any and all outstanding fees incurred prior to his transition to RJLF, and that he would continue to represent the Debtor on a fully *pro bono* basis such that he would not seek compensation for services rendered after his transition to RJLF (though RJLF reserved the right to seek reimbursement for litigation costs).

Initially, LNC objected to the Supplemental Application, stating that it was concerned that the terms of representation might be used to circumvent the Court's oversight of the disinterestedness of Mr. Bosco and RJLF (Docket No. 247), but after Mr. Bosco filed a Supplemental Declaration clarifying the terms of RJLF's proposed engagement (Docket No. 248), LNC withdrew its objection and the Court approved RJLF's employment as special counsel to the Debtor. (Docket Nos. 255 and 256.) RJLF and Mr. Bosco continue to represent the Debtor in the Second Appeal on a fully *pro bono* basis, and to do so despite having advised the Debtor earlier that fees in the Second Appeal could exceed $175,000. Securing free legal representation in the Second Appeal is beneficial to the Debtor and the estate.

## V. Legal Analysis.

## A. General Legal Framework for Appointment of a Chapter 11 Trustee.

As set forth above, on October 30, 2025, LNC filed the Trustee Motion. In the Trustee Motion, LNC requested that the Court appoint a Chapter 11 trustee pursuant to both Sections 1104(a)(1) and (a)(2). Section 1104(a) provides:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee —
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

Appointment of a trustee in a Chapter 11 case is an extraordinary remedy because it strips a debtor of the rights, powers, and duties of a debtor-in-possession. *In re Railyard Co., LLC*, 2016 WL 1254998, at *10 (Bankr. D.N.M. Mar. 30, 2016). "There is a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990) (citations omitted). However, Section 1104(a) "represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).

"Ultimately, the decision to appoint a trustee is fact intensive and must be made on a case-by-case basis." *In re Peak Serum, Inc.*, 623 B.R. 609, 621 (Bankr. D. Colo. 2020) (citing *In re Plaza de Retiro, Inc.*, 417 B.R. 632, 640 (Bankr. D.N.M. 2009)). "'The Court's task is to determine whether the totality of the circumstances warrant[s] appointment of a trustee.'" *Id.* (quoting *Plaza de Retiro*, 417 B.R. at 640). However, "[o]nce a bankruptcy court determines that cause exists for appointment of a trustee under section 1104(a)(1) or that appointment of a trustee would be in the best interest of creditors under section 1104(a)(2), 'it has no discretion but must appoint a trustee.'" *Sims v. Sims (In re Sims)*, 226 B.R. 284, at *4 (10th Cir. BAP 1997) (quoting *In re Okla. Refin. Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988)); *In re Celeritas Techs., LLC,* 446 B.R. 514, 518 (Bankr. D. Kan. 2011).

The movant bears the burden of demonstrating that a Chapter 11 trustee should be appointed. *Peak Serum*, 623 B.R. at 621; *In re Golden Park Estates, LLC*, 2015 WL 3643479, at *5 (Bankr. D.N.M. Jun. 11, 2015); *In re Colo.-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 173 (Bankr. D. Colo. 1990); *In re Nautilus of N.M., Inc.*, 83 B.R. 784, 788 (Bankr. D.N.M. 1988). But what standard should the Court employ to determine whether LNC has met its burden?

The *Peak Serum* court observed:

> [C]ourts are split regarding the standard of proof the movant must meet. The majority of courts hold that the movant must meet this burden by a clear and convincing standard of proof. *See In re Bayou Grp., LLC*, 564 F.3d 541, 546 (2d Cir. 2009); *In re G-I Holdings, Inc.*, 385 F.3d 313, 318 (3d Cir. 2004). Whereas, a minority of courts hold that the standard of proof is a preponderance of the evidence. *See In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011).

*Id.* at 621. The Tenth Circuit has not ruled on the issue.

At the conclusion of the evidentiary hearing, the Court ordered the parties to provide legal briefing on the standard of proof issue. Not surprisingly, LNC advocated for application of the preponderance of the evidence standard, while the Debtor argued

19

for the heightened clear and convincing evidence standard.  (Docket Nos. 279 and 280.)  Both parties cited to case law, including cases decided in this judicial district and others within the Tenth Circuit that arrived at conflicting conclusions.  The parties offered thoughtful legal argument in support of their positions.  Though this Court tends to be more persuaded by those courts which have concluded that the Tenth Circuit would likely adopt a preponderance of the evidence standard, the Court need not decide the issue, because it concludes that LNC did not meet its burden of proof even by the lower preponderance of the evidence approach.

**B.      Appointment of a Trustee Under Section 1104(a)(1).**

   **1.      Section 1104(a)(1) Statutory Framework.**

The first subsection of Section 1104(a)(1) mandates that a court appoint a trustee where a movant has demonstrated:

> . . . fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . .

11 U.S.C. § 1104(a)(1).

In making a determination of whether cause exists under Section 1104(a)(1), courts:

> . . . should consider enumerated and similar grounds in the context of the totality of the circumstances, including such things as management's competence and the quality of its business decisions, strategies and tactics; the debtor's policies, procedures and accounting practices; any financial improprieties; failure to maintain adequate records or to provide timely reports; the debtor's business with related parties; conflicts of interest; the actual or perceived dishonesty of debtor's management; and acrimony or loss of trust and confidence between the debtor and its creditors or employees or other parties with whom the debtor does business.  No single circumstance is necessarily determinative, and the importance ascribed to any particular circumstance must be considered in light of the whole.

*Railyard Co.*, 2016 WL 1254998, at \*11 (citations omitted).  *See also In re Intercat, Inc.*, 247 B.R. 911, 921 (Bankr. S.D. Ga. 2000) (listing similar factors); *In re Sundale, Ltd.*, 400 B.R. 890, 900 (Bankr. D. Fla. 2009) (listing similar factors); *In re Nartron Corp.*, 330 B.R. 573, 592 (Bankr. W.D. Mich. 2005) (listing similar factors).  The determination of whether the facts establish cause under Section 1104(a)(1) is vested in the Court's

discretion after considering the totality of the circumstances.  *Celeritas Techs.*, 446 B.R. at 518 (citing *Okla. Refin. Co.*, 838 F.2d at 1136).

### 2.      Summary of LNC's Arguments Under Section 1104(a)(1).

In the Trustee Motion, LNC asserted that multiple grounds compel the appointment of a trustee under Section 1104(a)(1).  *First*, LNC contended that Ms. Laurain's misconduct before the Louisiana Federal Court and the USPTO demonstrates that Ms. Laurain has a propensity for dishonesty and willingness to seek unfair advantage.  *Second*, LNC argued that Ms. Laurain breached her fiduciary duty in drawing an unauthorized $250,000 salary (in lieu of pre-petition distributions in the same amount).  *Third,* LNC stated that conflicts of interest prevent Ms. Laurain from satisfying her role as a fiduciary.  *Fourth*, LNC contended that Ms. Laurain is unwilling to pursue estate causes of action.  *Fifth*, LNC argued that the Debtor's financial reporting is inaccurate.  (Docket No. 170 at 18-25.)

### 3.      Ms. Laurain's Misconduct Before the Louisiana Federal Court and the USPTO Does Not Require the Appointment of a Chapter 11 Trustee.

LNC's principal argument for the appointment of a Chapter 11 trustee under Section 1104(a)(1) is that Ms. Laurain committed malfeasance years ago: (1) before the Louisiana Federal Court which resulted in an "unclean hands" determination by the Louisiana Federal Court in the Initial Ruling and Second Amended Ruling; and (2) before the USPTO which resulted in an "inequitable conduct" determination in the Second Amended Ruling.  LNC contends that the Louisiana District Court's "rulings are entitled to complete and preclusive effect under the mandate rule and collateral estoppel.  The pending appeal is irrelevant."  (Docket No. 279 at 1.)  Notably, LNC has not argued that Ms. Laurain committed fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor recently or during the bankruptcy case.

#### a.      Collateral Estoppel and the Mandate Rule.

LNC invokes collateral estoppel and asks the Court to apply factual findings and legal conclusions made by the Louisiana Federal Court in the Second Amended Ruling — many of which are highly critical of the conduct of Ms. Laurain and adverse to the Debtor.  According to the Tenth Circuit Court of Appeals:

> Collateral estoppel bars the successive litigation of any issue of law or fact "once [it has] been determined by a valid and final judgment." *Ashe v. Swenson,* [397 U.S. 436, 443] (1970).  That is, the doctrine "prevents a party that has lost the battle over an issue in one lawsuit from relitigating the same issue in another lawsuit." *Melnor, Inc. v. Corey (In re Corey),* 583 F.3d 1249, 1251 (10th Cir. 2009).  In this way, collateral estoppel, frequently referred to as "issue

21

preclusion," aims to promote judicial efficiency, encourage reliance on previously adjudicated matters, and avoid inconsistent rules of decision.

*Stan Lee Media, Inc. v. Walt Disney Co.,* 774 F.3d 1292, 1297 (10th Cir. 2014). "The doctrines of res judicata, or claim preclusion, and collateral estoppel, or issue preclusion, are closely related. *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1520 (10th Cir. 1990). Under res judicata, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94 (1980). "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Id.* By arguing for collateral estoppel recognition of the facts and determinations in the Second Amended Ruling, LNC focuses on issue or fact preclusion.

As LNC correctly notes, federal law governs the scope of the preclusive effect given to federal-court decisions based on federal claims, such as the Second Amended Ruling. *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) ("The preclusive effect of a federal-court judgment is determined by federal common law."); *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507–508 (2001); *In re Jordana,* 232 B.R. 469, 475 (10th Cir. BAP 1999), *aff'd,* 216 F.3d 1087 (10th Cir. 2000) ("Federal principles of collateral estoppel apply to prior judgments that are rendered by a federal court.").

For a fact or issue to be preclusive in a subsequent dispute under the federal common law of collateral estoppel, the party invoking the doctrine has the burden of establishing four separate elements:

> (1)  the issue [or fact] previously decided is *identical* with the one presented in the action in question,
>
> (2)  the prior action has been *finally adjudicated on the merits,*
>
> (3)  the party against whom the doctrine is invoked was a *party or in privity with a party* to the prior adjudication, and
>
> (4)  the party against whom the doctrine is raised had a *full and fair opportunity to litigate* the issue [or fact] in the prior action.

*Stan Lee Media*, 774 F.3d at 1297 (italics in original). *See also Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 978 (10th Cir. 1995); *Murdock v. Ute Indian Tribe of Uintah & Ouray Rsrv.,* 975 F.2d 683, 687 (10th Cir. 1992); *Moss v. Kopp,* 559 F.3d 1155, 1161 (10th Cir. 2009). As long as the facts or issues are identical, "issue

preclusion bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim." *Park Lake Res. LLC v. U.S. Dep't of Agr.,* 378 F.3d 1132, 1136 (10th Cir. 2004) (citation omitted).

LNC also invokes the mandate doctrine.  The mandate doctrine limits the matters which may be decided by a trial court after remand from an appellate court.  While district courts are free to take action consistent with a mandate, they cannot disturb any matter that was within the mandate.  As the Federal Circuit explained:  "'Unless remanded by this court, all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication.'" *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 757 F.3d 1366, 1371 (Fed. Cir. 2014) (quoting *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999)).

### b.   The Court Must Give Preclusive Effect to the Facts and Determinations in the Second Amended Judgment.

LNC has met its burden in requesting fact and issue preclusion under federal common law collateral estoppel factors.  *Stan Lee Media*, 774 F.3d at 1297.  Under the *first* collateral estoppel factor (*i.e.*, the issue or fact previously decided is identical with the one presented in the action in question), LNC merely asks that the court recognize the Louisiana Federal Court's findings of fact and legal determinations (for example, that Ms. Laurain made numerous misrepresentations to the USPTO to obtain the '903 Utility Patent and also presented "false or inconsistent testimony" to the Louisiana Federal Court during the trial).  In that sense, the facts and issues are identical.  The *third* collateral estoppel factor (*i.e.,* the party against whom the doctrine is invoked was a party or in privity with a party in the prior adjudication) also is plainly met.  The Debtor was a party in the Louisiana Federal Case and initiated the bankruptcy case.  The Debtor does not contest such points.

The Debtor challenges the *second* collateral estoppel factor (*i.e.*, the prior action has been finally adjudicated on the merits) on the ground that it would be inequitable to give preclusive effect to the facts and determinations in the Second Amended Ruling because the Debtor is pursuing the Second Appeal and may secure "reversal on appeal." (Docket No. 280 at 6-7.)   The Debtor's position is incorrect, because the Second Amended Ruling is a final adjudication which, under black-letter federal law, must be given collateral estoppel effect *even though* the Debtor appealed (and since the Debtor did not secure a stay on appeal).  The Federal Circuit put it this way:

> Moreover, the law is well settled that the pendency of an appeal has no affect [sic] on the finality or binding effect of a trial court's holding. *Deposit Bank v. Frankfort,* [191 U.S. 499] (1903). *See also* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4433 (1981).  That rule is applicable to holdings of patent invalidity as well.  *Alamance*

23

> *Industries, Inc. v. Gold Medal Hosiery Co.,* [194 F.Supp. 538, 540]  (S.D.N.Y.1961) . . . .

*SSIH Equip. S.A. v. U.S. Int'l Trade Comm.*, 718 F.2d 365, 370 (Fed. Cir. 1983).  Other courts are in accord.  *Williams v. Comm'r of Internal Revenue*, 1 F.3d 502, 504 (7th Cir. 1993) ("[A] judgment final in the trial court may have collateral estoppel effect even though the loser has not exhausted his appellate remedies."); *Erebia v. Chrysler Plastic Prods. Corp.*, 891 F.2d 1212, 1215 n.1 (6th Cir. 1989) ("It should be noted that the established rule in the federal courts is that a final judgment retains all of its preclusive effect pending appeal."); *McLendon v. Cont'l Grp., Inc.*, 660 F. Supp. 1553, 1562 (D.N.J. 1987) ("the fact that Continental may appeal the Third Circuit's ruling to the Supreme Court does not render the judgment non-final" for collateral estoppel purposes).

In the Louisiana Federal Case, the Louisiana Federal Court made a number of specific factual findings with respect to the Debtor's unclean hands.  For example, it found:  "The repeated false or inconsistent testimony, and misrepresentations from Mrs. Laurain establishes deceit."; and "At the bench trial, the Court heard evasive, false and misleading testimony and misrepresentations from the mouth of Mrs. Laurain, conduct that is offensive to the integrity of the Court."  (Ex. 44 at 132 and 133.)  Those facts led to the Louisiana Federal Court to decide that the Debtor had acted with unclean hands which barred the Debtor from prevailing on its counterclaims in the Louisiana Federal Case, including for infringement of the '327 Design Patent and the '903 Utility Patent.  The Debtor appealed the unclean hands ruling in the First Appeal.  The Federal Circuit affirmed the Louisiana Federal Court's dismissal of the Debtor's counterclaims, including for alleged infringement of the '327 Design Patent and the '903 Utility Patent.  *Luv n' Care,* 98 F.4th at 1094-96.  Notwithstanding the appeal, per *SSIH Equipment*, *Williams*, *Erebia*, *McClendon*, and a host of other decisions, the unclean hands issue has been definitively and finally adjudicated.  Per the doctrine of collateral estoppel and the mandate doctrine, those facts and that issue cannot be relitigated by the Debtor.  That is why the Federal Circuit confirmed that "LNC is the prevailing party — and will remain so no matter how the remand turns out . . . ."  *Id*. at 1106.  The Louisiana Federal Court's inequitable conduct findings in the Second Amended Ruling also are final for collateral estoppel purposes.  *SSIH Equip.*, 718 F.2d at 370.

The Debtor also challenges the *fourth* collateral estoppel factor (*i.e.*, the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue or fact in the prior action).  The Debtor contends that, on remand from the Federal Circuit on the inequitable conduct issue, the Louisiana Federal Court failed to "conduct any additional trial proceedings, hear additional testimony, or admit new evidence . . . ."  (Docket No. 280 at 2.)  And, the Debtor complains about asserted errors in the Second Amended Ruling, including that the District Court allegedly improperly used a technical advisor, "itself testified in violation of F.R.E. 605", and "excluded highly probative exculpatory evidence."  (*Id*. at 2-6.)  Nevertheless, this Court assesses that the Debtor had a "full and fair opportunity to litigate" in the Louisiana Federal Case.  After all, the Debtor has been involved in litigation in the Louisiana Federal Court for almost a decade.  And, the Louisiana Federal Court conducted an eight-day trial before issuing

24

extensive findings and fact and conclusions of law (both through the Initial Ruling and Second Amended Ruling).  The Debtor has been heard and had its day in court.  At best, the Debtor's arguments simply identify possible errors, but nothing that should preclude the Court from giving preclusive effect to the findings of fact and determinations set forth in the Second Amended Ruling.

So, the Court gives preclusive effect to the Second Amended Ruling, especially in relation to the Louisiana Federal Court's unclean hands and inequitable conduct findings and determinations.  To summarize, the Court accepts that the Debtor and Ms. Laurain "engaged in litigation misconduct" during the course of the Louisiana Federal Case (from 2016 to 2021), including by "failing to disclose certain patent applications during discovery, attempting repeatedly to block LNC from obtaining Ms. Laurain's prior art searches, stringing LNC along during settlement negotiations, and providing evasive and misleading testimony."  *Luv n' Care*, 98 F.4th at 1093.  The Court also accepts that the Debtor engaged in "deceit" and "reprehensible conduct" and attempted to gain an "unfair advantage" — all of which led the Louisiana Federal Court to determine that the Debtor engaged in unclean hands sufficient to bar the Debtor's counterclaims, including for alleged infringement of the '327 Design Patent and the '903 Utility Patent.  The Court further accepts that the Debtor and Ms. Laurain engaged in a pattern of "deceit," "misrepresentations" and "conscious and deliberate misconduct" before the USPTO from 2014 to 2016.  Such actions caused the Louisiana Federal Court to find that the Debtor engaged in inequitable conduct sufficient to bar the Debtor's counterclaims, including for alleged infringement of the '327 Design Patent and the '903 Utility Patent.

### c.      LNC Has Failed to Establish that the Misconduct and Dishonesty of the Debtor and Ms. Laurain Constitutes Cause for Appointment of a Chapter 11 Trustee.

The Court recognizes that the factual findings and determinations made by the Louisiana Federal Court in the Second Amended Ruling are very serious and highly critical of the Debtor and Ms. Laurain.  They show that the Debtor and Ms. Laurain engaged in a pattern of misconduct before the USPTO from submission of the Application (on July 17, 2014) through issuance of the '903 Utility Patent (on October 11, 2016).  Then, after LNC sued the Debtor (on June 4, 2016) and through the trial (in August 2021), the Debtor and Ms. Laurain engaged in extensive litigation malfeasance in the Louisiana Federal Case.  Among other things, the Debtor and Ms. Laurain failed to make proper disclosures in discovery and provided evasive and misleading testimony at trial.

LNC asserts that Ms. Laurain's conduct resulted in findings of unclean hands and of inequitable conduct by the Debtor, and that such findings demonstrate cause for appointment of a trustee for the Debtor's estate.  The Debtor disagrees, arguing that, even if Ms. Laurain is found to have acted with unclean hands or to have engaged in inequitable conduct, her actions occurred so long ago that the Court should not view them as bearing on her ability to lead the Debtor during the bankruptcy case.

25

Under Section 1104(a), dishonesty of a debtor in possession or its managers, either before or after the commencement of the bankruptcy case, may constitute cause for appointment of a trustee. Indeed, "the clearest examples [where appointment of a trustee is warranted] are those in which the debtor or its managers have engaged in serious fraud or dishonesty or have grossly mismanaged the business." Alan N. Resnick & Henry J. Sommer, 7 COLLIER ON BANKRUPTCY ¶ 1104.02[1] (Lexis/Nexis 16th ed. 2016).

But, although it is a close call, the Court discounts the malfeasance of the Debtor and Ms. Laurain for Section 1104(a) purposes because it occurred so long ago and is not directly tied to the bankruptcy case. The misconduct before the USPTO identified in the Second Amended Ruling occurred between ten to twelve years ago. The misconduct in the litigation process occurred between five to ten years ago. To be blunt, it all happened well in the past and is not particularly persuasive or probative evidence of the proclivity of the Debtor or Ms. Laurain to misbehave in the bankruptcy case. Such remote-in-time conduct does not establish grounds for appointment of a Chapter 11 trustee in this bankruptcy case.

Accepting LNC's arguments, there is no evidence that the Debtor or Ms. Laurain committed fraud or dishonesty either in the last five years or during the bankruptcy case. And, LNC has tendered no evidence of Ms. Laurain's being incompetent or engaging in gross mismanagement of the Debtor at any time. The significant time gap between the present and the USPTO misconduct (ten to twelve years ago) and the litigation misconduct (five to ten years ago) calls into serious question its probative value for purposes of Section 1104(a)(1). See, e.g., U.S. v. Miller, 883 F.2d 1540, 1545 (11th Cir. 1989, vacated on other grounds, 923 F.2d 158 (11th Cir. 1992) ("The remoteness of time, however, may decrease the probative value of extrinsic evidence."); U.S. v. Lavelle, 751 F.2d 1266, 1277 (D.C. Cir. 1985) (citing U.S. v. Foskey, 636 F.2d 517, 525 (D.C. Cir. 1980) for proposition that probative value decreases with time separating two events).

Fed. R. Evid. 609 is a helpful analog to illustrate the point. Fed. R. Evid. 609(b) presumptively limits the use of evidence of a prior criminal conviction of a witness for attacking a witness's character for truthfulness if the conviction happened ten years or more in the past. That is because what someone did ten years ago is not particularly probative of current circumstances. See Bradshaw v. Burns, 656 F. Supp. 3d 369, 372-73 (N.D. N.Y. 2023) ("The Court notes that the Plaintiff's 2010 convictions are relatively remote in time — they occurred over twelve years ago — and are therefore of lesser probative value than would be more recent convictions."); Twitty v. Ashcroft, 2010 WL 1677757, at *2 (D. Conn. April 23, 2010) ( holding that the "'probative value of a conviction decreases as its age increases'") (quoting 4 WEINSTEIN'S FEDERAL EVIDENCE, § 609.05[3][d] at 609-41 (2d ed. 2010). The same principle applies in the civil context.

While Section 1104(a)(1) allows the Court to consider fraud or dishonesty before a bankruptcy case is filed, remote-in-time circumstances rarely support appointment of a Chapter 11 trustee. The few cases cited by LNC on the topic are not helpful to LNC.

26

(Docket No. 279 at 6-8) (arguing that "the Court should not discount Mrs. Laurain's misconduct simply because it occurred between 2015 and 2021").

First, LNC referred to *Savino Oil*, 99 B.R. 518.  In that case, the court appointed a Chapter 11 trustee because:

> [t]he timing, facts and circumstances surrounding the formation of V. Savino II, execution of the . . . Agreement and activation of V. Savino II represented a calculated and calibrated effort *in contemplation of the Chapter 11 filing to place the Debtor's retail fuel operations beyond the reach of creditors*.

*Id*. at 526 (emphasis added).  So, the pre-petition misconduct was close in time to the bankruptcy filing and "in contemplation of it."  On that basis, and because the debtor failed "to disclose material and relevant information to the Court and creditors," the *Savino Oil* court appointed a Chapter 11 trustee.  *Id.*  That is not this case.  The second case mentioned by LNC is *Golden Park*, 2015 WL 3643479.  LNC cited *Golden Park* for the proposition that "[p]repetition conduct may be considered . . . ."  *Id*. at *5.  True enough.  But the *Golden Park* court did not rely on any pre-petition misconduct at all.  The reason the *Golden Park* court appointed a Chapter 11 trustee was because of post-petition misconduct, incompetence, and gross mismanagement.  Third, LNC cited *In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 671 (Bankr. W.D. Tenn. 1989).  Like the other cases, the *Microwave Products* court appointed a Chapter 11 trustee mainly, or perhaps exclusively, based on post-petition misconduct.  The last decision featuring in LNC's argument on pre-petition misconduct is *Gomez v. U.S. Tr.*, 2010 WL 582706 (D. W.Va. Feb. 18, 2010).  In *Gomez*, the debtor suffered an October 2008 indictment for misrepresentation, fraud, forgery, and deception in relation to attempting to obtain certain regulated drugs.  About five months later, he filed for Chapter 11 bankruptcy protection.  Then, post-bankruptcy he pled guilty.  The bankruptcy court appointed a Chapter 11 trustee.  On appeal, the *Gomez* court decided:

> While the court recognizes that the mere existence of a prior felony conviction will not justify the appointment of a trustee in every Chapter 11 case, the facts and circumstances surrounding Gomez's prior convictions clearly supported the bankruptcy court's decision in this case.

*Id*. at *2.  None of these cases supports a five-to-twelve-year look-back, untethered to post-petition misconduct.

Ultimately, the Court concludes that LNC failed to show that the non-bankruptcy misconduct identified in the Second Amended Ruling, which occurred between five to twelve years ago, constitutes cause to warrant the exceptional remedy of appointment of a Chapter 11 trustee.  This is especially so because Ms. Laurain did not testify falsely or commit litigation misconduct in bankruptcy case or the recent trial on the Trustee

27

Motion.  And, there is no other evidence of fraud, dishonesty, incompetence, or gross mismanagement of the Debtor either.

**4.      Ms. Laurain Has Not Breached Her Fiduciary Duties By Drawing a Reasonable Salary.**

"Because of the unique nature of the bankruptcy estate, the debtor in possession is considered a fiduciary of that estate." *Jensen v. U.S. Tr. (In re Smitty's Truck Stop, Inc.)*, 210 B.R. 844, 850 (10th Cir. BAP 1997) (citing *Interwest Bus. Equip., Inc. v. U.S. Tr. (In re Interwest Bus. Equip., Inc.)*, 23 F.3d 311, 317 (10th Cir.1994)).  "Because the [debtor in possession's] fiduciary obligation is to the estate, and not to one group, the [debtor in possession] must act to benefit the estate as a whole." *Microwave Prods.*, 102 B.R. at 671.  "[A] fiduciary — the debtor in possession — is proscribed from acting solely in its self interest to the exclusion of the other interests which the debtor-in-possession has the fiduciary obligation to protect." *In re Bellevue Place Assoc.*, 171 B.R. 615, 624 (Bankr. N.D. Ill. 1994).  "Fiduciary obligations include the duty of loyalty and good faith which forbid 'directors and other business operators from using their position of trust and control over the rights of other parties to further their own private interest, either by usurping opportunities, holding undisclosed conflicts, or otherwise exploiting their position.'" *In re SunCruz Casinos, LLC*, 298 B.R. 821, 830 (Bankr. S.D. Fla. 2003) (quoting *Microwave Prods.*, 102 B.R. at 672).  Further, the existence of numerous conflicts of interest between management and the interest of the estate can be sufficient grounds to find cause to appoint a trustee.  *Id.* at 830-32.  Mismanagement in the form of excessive compensation to owners of a debtor in possession may justify appointment of a trustee under Section 1104(a)(1).  *Chesapeake R&D Ltd. P-ship. v. N. Am. Comm'ns, Inc. (In re N. Am. Comm'ns, Inc.)*, 138 B.R. 175, 179 (Bankr. W.D. Pa. 1992).

LNC's second argument for the appointment of a Chapter 11 trustee under Section 1104(a)(1) is that Ms. Laurain breached her fiduciary duty in drawing an unauthorized $250,000 salary (in lieu of pre-petition distributions).  The argument deserves only cursory consideration because LNC introduced no evidence to support it.  As set forth in the Court's factual findings, Ms. Laurain received significant historical compensation from the Debtor prior to the Petition Date: $1,471,830.03 in 2012; $1,167,897.90 in 2022; $1,362,670.72 in 2023; and $342,131.48 in 2024.  Her average level of compensation was about eight percent (8%) of gross revenues.  In 2025, Ms. Laurain received $250,337.81 in compensation (salary and draws).  After the Petition Date, Mr. Laurain has received only salary.  For 2026, her salary is projected to be $250,000, which is about five percent (5%) of the Debtor's gross revenue.  Ms. Laurain has agreed to receive less compensation because the Debtor is generating less gross revenue.

Mr. Crawford testified as an expert witness on executive compensation.  His testimony was highly credible and uncontroverted.  Mr. Crawford testified that Ms. Laurain's post-Petition Date compensation is reasonable — even on the low end for a company of similar size.  The Court concurs.  And, contrary to LNC's argument,

28

management of a bankruptcy debtor may draw reasonable compensation.  The Debtor's payment of a reasonable salary to Ms. Laurain does not constitute fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor.  LNC failed to show that such salary demonstrates cause to appoint a Chapter 11 trustee under Section 1104(a)(1).

     **5.**       **<u>Ms. Laurain Is Not Subject to Conflicts of Interest that Prevent Her from Satisfying Her Fiduciary Duties</u>.**

LNC's third argument for the appointment of a Chapter 11 trustee under Section 1104(a)(1) is that alleged conflicts of interest prevent Ms. Laurain from satisfying her role as a fiduciary.  More particularly, LNC contends that the Debtor and Ms. Laurain's interests "were aligned pre-petition," but have become "diametrically opposed" post-petition. (Docket No. 170 at 21.)  In support of this contention, LNC points to its own attempts in the Louisiana Federal Case to extend liability to Ms. Laurain for the Second Amended Ruling (and Merits Judgment) and Fees and Costs Ruling (and Fees and Costs Judgment).  The suggestion is that there must be a conflict because if Ms. Laurain were to become liable for the Second Amended Ruling (and Merits Judgment) and Fees and Costs Ruling (and Fees and Costs Judgment), then it would behoove the Debtor to have Ms. Laurain, rather than the Debtor, pay LNC.  LNC contends that Ms. Laurain has become conflicted because she "has an overriding personal interest in protecting her own financial interests." (*Id*. at 21.)

The argument is all very circular and effectively moot.  Ms. Laurain was dismissed as a defendant early in the Louisiana Federal Case.  She is not directly liable on the Second Amended Ruling (and Merits Judgment) and Fees and Costs Ruling (and Fees and Costs Judgment).

At the time that LNC filed the Trustee Motion, it was actively attempting to add Ms. Laurain as a defendant in the Louisiana Federal Case and hold Ms. Laurain personally liable for the Fee Award.  But, the Louisiana Federal Court ruled that Ms. Laurain will not be personally liable.  So, the argument that Ms. Laurain's prospective co-liability for the Fee Award prevents her from fulfilling fiduciary responsibilities to the Debtor in connection with the Louisiana Federal Case appears to have been rendered moot.  In any event, LNC failed to meet its burden to showing a conflict of interest establishing cause for appointment of a Chapter 11 trustee under Section 1104(a)(1).

     **6.**       **<u>LNC Failed to Establish that the Debtor's Alleged Failure to Pursue Causes of Action Constitutes Cause for Appointment of a Chapter 11 Trustee</u>.**

LNC's fourth argument for the appointment of a Chapter 11 trustee under Section 1104(a)(1) is that the Debtor is unwilling to pursue causes of action against Ono, LLC, and Mr. Williams.  Failure to make "impartial investigations and decisions in pursuing claims on behalf of the estate" can constitute case for appointment of a Chapter 11 trustee. *In re Picacho Hills Util. Co., Inc.*, 518 B.R. 75, 82 (Bankr. D.N.M. 2014)

(quoting *Matter of Fiesta Homes of Ga., Inc.*, 125 B.R. 321, 326 (Bankr. S.D. Ga. 1990)).  *See also NBD Park Ridge Bank v. SRJ Enters., Inc. (In re SRJ Enters., Inc.)*, 151 B.R. 189, 194-95 (Bankr. N.D. Ill. 1993) ("[C]ause may exist pursuant to § 1104(a)(1) for the appointment of a trustee when the debtor in possession breaches this duty and unjustifiably fails to institute a suit to recover a voidable preference.").

With respect to LNC's assertion that "Mrs. Laurain . . . failed to take any action to collect indebtedness owed by Ono, LLC," LNC introduced no evidence to support its allegation.  Instead, Ms. Laurain testified at trial that the Debtor had collected the receivable owed by Ono, LLC.  LNC did not contest the point.  So, LNC's argument fails.

LNC also criticized the Debtor for not investigating or pursuing potential legal malpractice claims against Mr. Williams arising from his representation of the Debtor as a patent agent.  Recall that the Louisiana Federal Court found in the Second Amended Ruling that Mr. Williams engaged in misconduct and inequitable conduct in assisting the Debtor.  At trial, Ms. Laurain confirmed that the Debtor had not investigated or pursued potential malpractice claims against Mr. Williams as of yet.

But the Debtor is bankrupt.  It has limited financial resources and limited staff and is required to balance the costs of bringing a lawsuit against its former patent agent against the prospective benefits to be gained from the lawsuit.  If the Debtor had to fund such a lawsuit and to divert personnel from business operations to litigation, it might well deprive itself of the resources it needs to reorganize.  Moreover, malpractice cases are not easy to prove — especially when the definitive outcome of the underlying litigation is not yet known.  The Second Appeal (which includes the inequitable conduct findings made against Mr. Williams) is pending.  Until the Second Appeal is completed, it may be difficult for the Debtor to prove that  Mr. Williams's conduct damaged the Debtor.  The Court encourages the Debtor to fully investigate potential claims against Mr. Williams and pursue such claims if cost-beneficial.  However, LNC failed in its burden to prove the viability and benefit of such potential litigation.  Thus, the issue does not support the appointment of a Chapter 11 trustee, at least at this juncture.

### 7.   **LNC Failed to Establish that the Debtor's Financial Reporting Is Inaccurate.**

LNC's fifth argument for the appointment of a Chapter 11 trustee under Section 1104(a)(1) is that the Debtor's financial reporting is inaccurate. (Docket No. 170 at 18-25.)  The allegation is quite an overstatement.  As set forth in the Trustee Motion, the Debtor made a single, non-material mathematical error on its August 2025 Monthly Operating Report listing accumulated net profit or loss for the period.  The error carried over to subsequent months.  At trial, LNC provided no other evidence of any alleged inaccuracies in the Debtor's financial reporting.  The Court finds that the Debtor has filed all required Monthly Operating Reports.  There is no evidence that the reporting of revenues or expenses was inaccurate.  The Debtor only made a single addition/subtraction error on one Monthly Operating Report resulting in an $8,921

discrepancy in accumulated net profit or loss, which carried over.  The discrepancy was minor and immaterial.  To state the obvious, making a single, relatively insignificant mathematical error on one Monthly Operating Report definitely is not cause for appointment of a Chapter 11 trustee under Section 1104(a)(1).  LNC must have understood the weakness of its position because LNC did not raise the point in Closing Argument.

**8.      In the Totality of the Circumstances, LNC Failed to Prove Cause under Section 1104(a)(1).**

The Court has considered each of the Section 1104(a)(1) arguments presented by LNC separately.  However, the Court also has considered the totality of the circumstances.  *Peak Serum*, 623 B.R. at 621  ("The Court's task is to determine whether the totality of the circumstances warrant appointment of a trustee.")  Based on the evidence submitted at trial, the Court assesses that the LNC failed to prove, by a preponderance of the evidence, cause to appoint a Chapter 11 trustee under the totality of the circumstances.

**C.      Appointment of a Trustee Under Section 1104(a)(2).**

**1.      Section 1104(a)(2) Statutory Framework.**

Under Section 1104(a)(2), the court shall order the appointment of a trustee "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate."  Under Section 1104(a)(2), "[t]he court is vested with even broader discretionary powers  [than under Section 1104(a)(1)] and may consider equitable factors to determine whether a trustee is in the interests of the estate and its creditors."  *Celeritas Techs.*, 446 B.R. at 518 (citing *Savino Oil*, 99 B.R. at 525).  *See also Peak Serum*, 623 B.R. at 620 (citing *Celeritas Techs.*).  As the Court in *Celeritas Techs.* explained:

> As with the analysis of cause under § 1104(a)(1), [such equitable factors include] the debtor's ability to fulfill its duty of care to protect the assets, its duty of loyalty, and its duty of impartiality is at the base. . . .  Perceived dishonesty or the withholding of information supports the appointment of a trustee. . . .  "One of the most fundamental and crucial duties of a debtor-in-possession upon the filing of a Chapter 11 petition is to keep the Court and creditors informed about the nature, status and condition of the business undergoing reorganization." . . .  Other factors may include (i) the overall management of debtor, both past and present, (ii) the trustworthiness of debtor's management, (iii) the confidence or lack thereof of the business community and of creditors in present management, and (iv) practical considerations,

31

> such as the benefits derived by the appoint of a trustee,
> balanced against costs. . . .

*Celeritas Techs.*, 446 B.R. at 520-21 (internal citations omitted).

Much of the foregoing overlaps with Section 1104(a)(1) analysis.  But, the Court also should evaluate the practical realities and necessities and consider "the debtor in possession's past and present performance and prospects for the debtor's rehabilitation" and "the benefits derived by appointment of a trustee, balanced against the costs of appointment."  *Colorado-Ute*, 120 B.R. at 176 (quoting *Ionosphere Clubs,* 113 B.R. at 167.

> ### 2.        LNC Has Not Met Its Burden for the Appointment of a Chapter 11 Trustee Under Section 1104(a)(2).

In the Trustee Motion, LNC recognized the overlap between Sections 1104(a)(1) and (a)(2) and stated: "The Section 1104(a)(1) factors also lend support to the appointment of a trustee under Section 1104(a)(2)."  (Docket No. 170 at 26.)  The Court also acknowledges some similarity in the considerations and so adopts all of its Section 1104(a)(1) analysis as part of its 1104(a)(2) considerations.  But beyond those factors, the Court considers the following additional issues under the special circumstances of this bankruptcy case: (1) the Debtor's post-petition financial performance; (2) the Debtor's prospects for rehabilitation; (3) animosity between LNC and the Debtor; and (4) the benefits and detriments of a Chapter 11 trustee.

First, with respect to financial performance, the Debtor is better off financially now than just prior to the Petition Date.  From a cash flow perspective, the Debtor has held its own.  The Debtor started June 2025 with $65,603 in cash.  As of June 2026, the Debtor ended with $463,547 in cash while also increasing its accounts payable, inventory, and total assets (although its post-petition payable also increased to a lesser extent).  The Court projects that the Debtor will earn $4,768,000 in annual gross revenue for 2026 (based on the first half of the year).  So, under Ms. Laurain's leadership, the Debtor is operating successfully in Chapter 11.  Aside from operational success, Ms. Laurain has reached an agreement with the Debtor's appellate counsel in the Second Appeal, RJLF, whereby RJLF will prosecute the Second Appeal for free.  So, Ms. Laurain has been successful in limiting the accrual of post-petition administrative expenses.

Second, regarding rehabilitation, the Debtor has filed a Disclosure Statement and Plan.  The Plan proposes continuing operations and payouts to creditors.  At the joint request of the parties, the Court deferred the confirmation process until after this decision on the Trustee Motion.  However, suffice to say that the Debtor has made at least some efforts toward reorganization.  Given LNC's role in the bankruptcy case, the reorganization process may be difficult.  Perhaps it will not work.  But, at this stage, the Debtor has earned the right to move forward and try.

32

Third, with respect to animosity, the Court recognizes that the Debtor and LNC (and their respective management personnel) do not like each other. Ms. Laurain and Mr. Hakim have engaged in appalling conduct toward each other. LNC and the Debtor have been in active, aggressive, and hard-fought litigation for over a decade. The Court cannot definitively assign blame for the animosity between the parties. Probably, both the Debtor and LNC both share the blame. But, the Court is very reticent to appoint a Chapter 11 trustee based merely on a shared animosity especially when it remains unclear whether the parties are at a complete impasse. *See In re Marvel Ent. Grp., Inc.,* 140 F.3d 463, 473 (3d Cir. 1998) (affirming appointment of Chapter 11 trustee in egregious circumstances but stating: "We expressly hold that there is no per se rule by which mere conflicts or acrimony between debtor and creditor mandate appointment of a trustee."). The Court assesses that it would be best to allow the reorganization process to move forward, at least at this stage.

Finally, weighing the costs and benefits, the Court concludes that Ms. Laurain is best positioned to manage and operate the Debtor at this time vis-à-vis an anonymous Chapter 11 trustee. She founded the Debtor. She designed and developed the Dining Mat. Ms. Laurain has become an expert in the feeding of young children, and cares deeply about developing and producing tools that help children meet developmental milestones and make feeding, toothbrushing, and other functions easier for their caregivers. Ms. Laurain is competent and capable. She has dedicated substantial amounts of time and effort in the Debtor's business. She is energetic and enthusiastic about the Debtor's prospects. She hired and has worked with the Debtor's employees for many years. She possesses the relationships with the Debtor's customers and vendors. She has a proven track record of financial performance. In sum, Ms. Laurain is the most important advocate and key manager of the Debtor. The Court harbors very serious doubts that a Chapter 11 trustee would be successful in replacing Ms. Laurain at the helm of the Debtor. The Debtor is a closely-held company. If Ms. Laurain is replaced, she and the current employees might not stay. In the hands of a Chapter 11 trustee, the Debtor's future would be highly uncertain. The Court's educated guess is that appointing a Chapter 11 trustee could well result in liquidation, a prospect which likely would not be beneficial to creditors and equity security holders of the Debtor. Notably, no other creditors of the Debtor have weighed in to support appointment of a Chapter 11 trustee.

The Court also cannot help but be suspect of LNC's motives in opposing the Debtor's efforts and trying to replace Ms. Laurain. LNC is one of the Debtor's major commercial competitors. If Ms. Laurain were divested of control of the Debtor and replaced by someone without Ms. Laurain's drive and concern for the Debtor, that might well provide a competitive advantage to LNC. Further, replacing Ms. Laurain with someone without the deep knowledge of the procedural history of the litigation between LNC and the Debtor, and of the underlying dynamics between the parties, might well benefit LNC. LNC provided no evidence that replacing Ms. Laurain with a Chapter 11 trustee would be in the best interests of creditors *other than LNC*.

33

The Court finds that LNC has not met its burden of showing that the exceptional remedy of appointment of a Chapter 11 trustee is in the best interests of creditors and equity security holders at this time.  So, appointment of a Chapter 11 trustee is not warranted under Section 1104(a)(2).

## VI.   Conclusion and Order.

For the reasons set forth above, it is

ORDERED that the Trustee Motion is DENIED.  It is

FURTHER ORDERED that the Debtor shall file by a notice by no later than **August 14, 2026**, advising the Court as to its intentions with respect to prosecution of the Disclosure Statement and Plan.

DATED this 4th day of August, 2026.

BY THE COURT:

Thomas B. McNamara
United States Bankruptcy Judge